# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL PERRY, and <br> CONDOMINIUM HOUSING, INC., <br>     Plaintiffs-in-Cross Claim, <br> <br> v. <br> <br> STEVEN BLUM, as Trustee of <br> Moorings Nominee Trust, <br>     Defendant-in-Cross Claim, <br> <br> and <br> <br> STEPHEN YELLIN and ELAINE YELLIN, <br>     Reach and Apply Defendants. | Civil Action No. 99cv12194-NG |

GERTNER, D.J.:

## MEMORANDUM AND ORDER
May 25, 2011

The current dispute in this twelve-year-old case revolves around a series of transfers of two notes that were originally tied to the Fenmore property. Stephen Yellin ("Yellin") and Michael Perry ("Perry"), as equal shareholders in Condominium Housing, Inc. ("CHI"), purchased the Fenmore from Harold Brown ("Brown") in 1985. The purchase price included two promissory notes with an aggregate value of $11 million ("the Notes"). Over time, Yellin and Perry made some payments on the Notes, but they ultimately came into arrears. When Brown also encountered financial difficulties -- including bankruptcy -- Yellin, through a straw, Steven Blum, as Trustee of Moorings Nominee Trust ("Blum"), bought the Notes back from him for $950,000. Blum foreclosed on the Fenmore; it was sold at auction for $9,450,000. Perry brought this claim against his partner, Yellin, and Blum for an accounting of the foreclosure proceeds and all rents collected. The question, then and now, is how much of the proceeds of

that foreclosure sale should be distributed to Yellin and his straw, Blum, as owner of the Notes, and how much will be left to be distributed to Yellin and Perry as 50/50 shareholders of CHI.

After seven days of trial, I determined by judicial estoppel that the value of the Notes as of the date of the foreclosure was $2,262,105. See Mem. & Order Re: Findings of Fact and Concl. of Law (document #210) [hereinafter Perry I]; Mem. & Order Re: Mots. for Recons. (document #228) [hereinafter Perry II]. On appeal, the First Circuit held that judicial estoppel could not apply and directed that I rework the accounting to determine "the actual amount due on the Notes." Perry v. Blum, No. 09-1977, at 33 (1st Cir. Oct. 1, 2010) (document #280) [hereinafter Perry III].[1] Both parties agree that I can decide the actual amount due on the Notes based on the evidence already in the record. Three legal issues remain: I) how to treat the $1,000,000 accounting error; ii) whether the prior payments made on the Notes should be applied first to interest or to principal; and iii) whether to apply an interest rate of eight percent or fourteen percent to the debt. I will address each of these questions below.

For reasons I will explain, I will reserve holding on the first question (the $1 million error) in order to weigh the equities. I will ask the parties to present calculations according to my holdings on the latter two questions, and then I will reach a final conclusion on the actual value of the Notes.

I.      FACTUAL BACKGROUND

For a thorough review of the facts of this case, see Perry I, at 7-19; and Perry III, at 2-8. Those facts are incorporated here by reference.

---

[1] Note that the First Circuit upheld the rest of the findings of law, including my calculations as to the equity of redemption and my finding that the Yellins were properly joined as defendants. Contrary to the Yellins' assertions, those issues are no longer before the Court. See generally Perry III, at 23-33.

More specifically, in my Memorandum & Order on the Motions for Reconsideration, I made the following findings that bear directly on the questions now before the Court:

1. **The "million dollar mistake."** In 1996, Brown's accountant, Robert Blank, left off $1,017,140.00 of calculated interest when transferring his handwritten calculations from the third page to the fourth page of his worksheet. See Hr'g Exh. 5 at 3-4. Despite its magnitude, the Court found and all parties agreed that this error was a "blatant, good faith" mistake. See Oct. 31, 2008 Mem. at 28.

2. **Application of payments to principal rather than interest**. Second, CHI's payments on the Fenmore Notes were applied first to principal and then to interest. Yellin now argues that under the so-called "Massachusetts Rule," these payments should have been applied in the reverse order -- first to interest and only then to principal. At trial, however, Perry offered evidence that certain payments were deliberately applied to principal at the parties' common agreement, allowing Perry and Yellin to reduce their debt while Brown received cash in lieu of foreclosing. See Hr'g Exh. 5 & 68. The Notes themselves do not specify how payments were to be counted and Blank, the accountant, testified at his deposition that he could not recall why he applied the payments as he did. In the Court's view, this error does not appear to be a "mistake," so much as the accepted practice of the parties at the time, particularly where other types of payments were credited against interest. Compare Hr'g Exh. 5 at 2 (applying periodic payments to interest), with Hr'g Exh. 5 at 1 (applying "cash for closings" payments to principal).

3. **Eight percent interest rate**. The record shows that Brown instructed his accountant to apply an 8 percent interest rate to the Notes, based on his personal estimate of the average variable rate from 1990 to 1996. Yet the Notes themselves provided that a 14 percent fixed rate should apply. See Hr'g Exh. 1, 2, & 5. It is clear that the interest rate was not a mere "mistake" by Brown's accountant, but resulted from Brown's own efforts to avoid a more complicated interest calculation. Needless to say, Brown could have easily confirmed the true interest rate and amount owed, had he wanted to.

Perry II, at 4-5.

## II. ANALYSIS

Upon remand, the First Circuit has directed me to determine the "actual value" of these notes. Perry III, at 33. Although the particular legal construct of judicial estoppel does not apply, the accounting nevertheless must be an equitable accounting. The First Circuit explained,

> [T]he challenged calculations are not entries on a closing sheet at a foreclosure but, rather, are calculations made in the context of a judicial accounting. This matters because an accounting is not a rote exercise in arithmetic. To the contrary, it is an equitable remedy, see Braunstein v. McCabe, 571 F.3d 108, 122 (1st Cir. 2009) (citing Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 49 n. 7 (1989)), and equitable remedies "are flexible tools to be applied with the focus on fairness and justice." Demoulas v. Demoulas, 703 N.E.2d 1149, 1169 (Mass. 1998) (citing 1 Dan B. Dobbs, Law of Remedies § 2.1(3), at 63 (2d ed. 1993)).

Id. at 26. As such, principles of fairness and equity are relevant to this analysis. As I endeavor to "determine the actual value" of the Notes at the time of the foreclosure, then, I will continue to approach this accounting equitably. It is not simple arithmetic.

As I will explain, the key question in this analysis is the true value of the Notes when they were sold to Blum (Yellin's straw), or the amount due under the Notes at the time of the sale. Blum was not a holder in due course; as successor-in-interest he took the Notes subject to all of the defenses applicable to Brown. Perry II, at 12; Mass. Gen. Laws ch. 106, §§ 3-302, 3-305. When he bought the Notes from Brown, therefore, Blum was entitled only to that amount to which Brown himself was entitled. And where Brown had made express decisions about how payments should be allocated, Blum will be held to those allocations.

### A. Million-dollar Mistake

When Brown sold the Notes to Blum, his accountant, Robert Blank ("Blank"), miscalculated their value by $1 million. All of the parties agree that this accounting error was a

simple mistake made from one page to another.  The plaintiffs maintain that Blum (or Yellin) should not reap the benefit of the mistake given the history of their dealings.  As I have said, equity remains relevant to this analysis, and I agree that Yellin would be unjustly enriched were he to benefit to the tune of $1 million from this mistake.  The First Circuit has expressly held that I may consider unjust enrichment in judicial accounting.  See Perry III, at 28 ("In this context, we think that the district court acted within the sphere of its discretion in preventing Yellin from unjustly enriching himself, to the detriment of his quondam partner, by what the district court warrantably found were underhanded dealings.").  Nevertheless, I will therefore reserve ruling on this question until I have received calculations from the parties according to my holdings below.

        **B.**      **Prior Payments Made on the Notes**

As a general rule, where payments are made on a debt, they must be applied first to interest and then to principal unless the parties have agreed otherwise.  Connecticut Valley Sanitary Waste Disposal, Inc. v. Zielinski, 436 Mass. 263, 271 (2002) (quoting City Coal Co. of Springfield v. Noonan, 424 Mass. 693, 696 (1997)) ("[W]hen a debtor pays money to a creditor, absent any express agreement to the contrary, the payment is first applied to the outstanding interest obligation and then to principal.").  Where, however, a course of conduct "clearly expressed [an] intention to handle allocation in some other way," the presumption does not apply.  Nat G. Harrison Overseas Corp. v. Am. Barge Sun Coaster, 475 F.2d 504, 507 (5th Cir. 1973).

In this case, Yellin contends that the parties never agreed to apply any of the payments to principal and therefore all of those payments must be allocated to interest.  I have already found,

however, that the evidence belies Yellin's contention. Perry offered evidence at trial that some payments were deliberately applied to principal at the parties' common agreement, allowing Perry and Yellin to reduce their debt while Brown received cash in lieu of foreclosing. See Hr'g Exs. 5, 68; Perry II at 4. Perry and Yellin divided the Fenmore into condominium units and sold some of the apartments. When they made a sale, they made a special payment to Brown, and Blank recorded it as "Amts. Received from Closings" and applied it to principal. Hr'g Ex. 5, at 1. Brown gave partial releases of the mortgage on those units sold so that the new owners received clear title to the property. Having heard this evidence at trial, I determined, "In the Court's view, this error does not appear to be a 'mistake,' so much as the accepted practice of the parties at the time, particularly where other types of payments were credited against interest." Perry II, at 4.

In this case, where there was a course of conduct -- and documents -- that reflected an express agreement to apply these payments to principal, I hold that the payments indeed must be applied to principal for the purpose of determining the amount due on the Notes at the time of their sale to Blum.

### C. Interest Rate

Finally, the parties dispute the interest rate on the Notes. The Notes indicate a fourteen percent interest rate on their face, but it is undisputed that from 1990 to 1996, Brown applied an eight percent interest rate to the debt.[2] Here again, the interest rate that Brown chose to apply

---

[2] At trial, Brown testified:

> Q: Do you remember whether or not a new rate was established for these notes?
>
> A: My recollection is that Mr. Blank asked me what rate I should charge him and I told him -- my recollection was 8 percent.

during the time that he held the Notes affects the amount due at the time of their sale to Blum. For much of the time that Brown held the Notes, CHI was in arrears. And Brown allowed CHI to effectively reduce the amount that it owed on the Notes both in terms of attributing payments to principal and applying an eight percent interest rate. The value of the Notes at the time that he sold them to Blum -- at a substantially reduced rate -- was indeed less than it would have been had he applied the fourteen percent interest rate or had he applied all the payments to interest. As holder in due course, he intentionally made these choices as was his prerogative in order to receive cash without foreclosure. I hold that an eight percent interest rate will apply to this time period as Brown clearly intended.

I will not, however, apply an eight percent interest rate to the Notes after their sale to Blum as the plaintiff requests. While Brown had the prerogative to charge a lesser interest rate or to apply payments to principal, he was not *required* to do so under the Note. Again, as successor in interest and not holder in due course, Blum is subject to those defenses as against Brown. Here, however, CHI would have no defense to Brown should Brown have decided -- in

---

Trial Tr. vol. 3, 12-13, Feb. 17, 2005.

> Q: How did Mr. Blank get an average prime rate of 8 percent?
>
> A: I gave him that rate.
>
> Q: And did you have a conversation with him? Do you remember?
>
> A: Yes.
>
> Q: What was that conversation?
>
> A: "What rate should I use?" And I said, "8 percent."

Trial Tr. vol. 3, 27.

1996 -- to begin to apply the fourteen percent interest rate on the face of the Notes. And as such, CHI has no defense as to Blum in this regard.

Therefore, I find that an eight percent interest rate applies to the Notes from 1990-1996 and a fourteen percent interest rate applies thereafter.

## III. CONCLUSION

Each party is to submit a calculation of the current value of the Notes in accordance with this decision by June 6, 2011. I will consider those calculations in my judicial accounting to determine the actual value of the Notes.

**SO ORDERED.**

**Date: May 25, 2011**         */s/ Nancy Gertner*
                        **NANCY GERTNER, U.S.D.J.**