UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF MASSACHUSETTS

**MICHAEL PERRY, and** )
**CONDOMINIUM HOUSING, INC.,** )
    **Plaintiffs-in-Cross Claim,** )
     )
    v. )    Civil Action No. 99cv12194-NG
     )
**STEVEN BLUM, as Trustee of** )
**Moorings Nominee Trust,** )
    **Defendant-in-Cross Claim,** )
     )
    and )
     )
**STEPHEN YELLIN and ELAINE YELLIN,** )
    **Reach and Apply Defendants.** )

**GERTNER, D.J.:**

                              **MEMORANDUM AND ORDER**
                                    June 16, 2011

      As I explained in my order on May 25, 2011, the current dispute in this twelve-year old case revolves around a series of transfers of two notes that were originally tied to the Fenmore property:

> Stephen Yellin ("Yellin") and Michael Perry ("Perry"), as equal
> shareholders in Condominium Housing, Inc. ("CHI"), purchased
> the Fenmore from Harold Brown ("Brown") in 1985. The
> purchase price included two promissory notes with an aggregate
> value of $11 million ("the Notes"). Over time, Yellin and Perry
> made some payments on the Notes, but they ultimately came into
> arrears. When Brown also encountered financial difficulties --
> including bankruptcy -- Yellin, through a straw, Steven Blum, as
> Trustee of Moorings Nominee Trust ("Blum"), bought the Notes
> back from him for $950,000. Blum foreclosed on the Fenmore; it
> was sold at auction for $9,450,000. Perry brought this claim
> against his partner, Yellin, and Blum for an accounting of the
> foreclosure proceeds and all rents collected. The question, then
> and now, is how much of the proceeds of that foreclosure sale
> should be distributed to Yellin and his straw, Blum, as owner of
> the Notes, and how much will be left to be distributed to Yellin
> and Perry as 50/50 shareholders of CHI.

> After seven days of trial, I determined by judicial estoppel that the
> value of the Notes as of the date of the foreclosure was $2,262,105.
> See Mem. & Order Re: Findings of Fact and Concl. of Law
> (document #210) [hereinafter Perry I]; Mem. & Order Re: Mots.
> for Recons. (document #228) [hereinafter Perry II]. On appeal, the
> First Circuit held that judicial estoppel could not apply and
> directed that I rework the accounting to determine "the actual
> amount due on the Notes." Perry v. Blum, No. 09-1977, at 33 (1st
> Cir. Oct. 1, 2010) (document #280) [hereinafter Perry III].

Mem. & Order, at 1-2 (document #294) [hereinafter Perry IV].

On remand, three legal issued remained: I) whether the prior payments made on the Notes should be applied first to interest or to principal; ii) whether to apply an interest rate of eight percent or fourteen percent to the debt; and iii) how to treat the $1,000,000 accounting error. I determined that payments that were deliberately applied to principal at the parties' common agreement -- allowing Perry and Yellin to reduce their debt while Brown received cash in lieu of foreclosing -- should indeed be applied towards principal for determining the amount due on the Notes at the time of their sale to Blum. Id. at 6. I also concluded that an eight percent interest rate applied to the Notes from 1990 - 1996 (when Brown applied a lower rate to the Notes) and a fourteen percent interest rate applied thereafter. Id. at 8. I reserved, however, on the question of the $1 million error. Id. at 5. I now conclude that the $1 million error should not be corrected as a matter of equity.

The "million dollar mistake" occurred in 1996, when Brown's accountant, Robert Blank, left off $1,017,140.00 of calculated interest as he was transferring his handwritten calculations from the third page to the fourth page of his worksheet. See Hr'g Exh. 5 at 3-4. The Court found and all parties agreed that this error was a "blatant, good faith" mistake. See Oct. 31, 2008 Mem. at 28. The mistake, however, had extraordinary consequences. It meant that the Notes were

significantly devalued when they were sold to Yellin (through Blum); and, if added to their value now, the $1 million would result in a windfall to Yellin.

If judicial accounting were mere arithmetic, then the $1 million would certainly have to be corrected to determine the value of the Notes. But the First Circuit has explicitly directed in this case that judicial accounting is *not* arithmetic and that I may consider equity:

> [T]he challenged calculations are not entries on a closing sheet at a foreclosure but, rather, are calculations made in the context of a judicial accounting. This matters because an accounting is not a rote exercise in arithmetic. To the contrary, it is an equitable remedy, see Braunstein v. McCabe, 571 F.3d 108, 122 (1st Cir. 2009) (citing Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 49 n. 7 (1989)), and equitable remedies "are flexible tools to be applied with the focus on fairness and justice." Demoulas v. Demoulas, 703 N.E.2d 1149, 1169 (Mass. 1998) (citing 1 Dan B. Dobbs, Law of Remedies § 2.1(3), at 63 (2d ed. 1993)).

Perry III, at 26. Indeed, the First Circuit shared my concern that Yellin not be unjustly enriched and upheld my accounting as to the calculations of the equity of redemption -- even though they were not consistent with the ordered allocation of mortgage proceeds required by property law. The First Circuit further explained:

> In performing an equitable accounting, the district court is not a mere scrivener, charged with carrying out a ministerial task. Instead, the court is charged with tempering arithmetic with equity, or, as we phrased it in Rosario-Torres, 889 F.2d at 323, "bring[ing] the scales into balance." In this context, we think that the district court acted within the sphere of its discretion in preventing Yellin from unjustly enriching himself, to the detriment of his quondam partner, by what the district court warrantably found were underhanded dealings.

Id. at 27-28. The same equities are at issue here. Yellin acted to the detriment of his partner, Perry, when he purchased the Notes through a straw. He has already benefitted from this underhanded arrangement; I will not add another $ 1 million to his windfall.

-3-

Accordingly, I conclude that the value of the Notes at the time of sale is calculated as follows:

| | |
|---|---:|
| Principal due on the Notes as of October 1996 | $902,662 |
| Interest due on the Notes as of October 1996, which includes application of 8% interest from 1990 through October 1996 | $950,620 |
| Interest at 8% due for the period November 1, 1996 through December 16, 1996. | $9,227 |
| Additional interest from December 17, 1996 to May 31, 2002 at 14% | $695,046 |
| Additional interest on deferred principal | $101,689 |
| 1% fee applicable in the event of foreclosure. | $91,840 |
| Late fees from November 1996 to May 31 2002, at 3% | $58,649 |
| **Total Amount Due on Notes as of May 31, 2002** | **$2,809,734** |

And therefore, the amount to be distributed to Perry and Yellin is calculated:

| | |
|---|---:|
| Proceeds of Foreclosure | $11,110,797 |
| Costs of closing | $154,440 |
| Value of Notes | $2,809,734 |
| Net Proceeds | $8,035,826 |
| **Share due to each partner** | **$4,017,913** |

Judgment will enter for Perry in the amount of Four Million, Seventeen Thousand, Nine Hundred Thirteen And 00/100 ($4,017,913.00) Dollars, plus pre-judgment interest at the simple statutory rate of 12% per annum, accruing as of June 6, 2002.

**The parties are to submit a form of judgment by June 20, 2011**.

**SO ORDERED.**

**Date: June 16, 2011**              /s/ *Nancy Gertner*
                             **NANCY GERTNER, U.S.D.J.**